# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00205-CV

---

**Michael Nitz, Appellant**

**v.**

**Melanie Ann Bouffard, Appellee**

---

### FROM THE 480TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 13-2732-FC4, THE HONORABLE TERENCE M. DAVIS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Michael Nitz appeals from the district court's order in appellee Melanie Ann Bouffard's suit to modify the parent-child relationship involving their daughter A.E.N. ("Amy"), who was approximately thirteen years old at the time of the order.[1] After Nitz failed to appear at the final hearing, the district court issued a default judgment against him. Nitz filed a motion for new trial, which the district court denied. In two issues on appeal, Nitz asserts that the district court abused its discretion in denying his motion for new trial because (1) he did not receive proper notice of the final hearing and (2) he satisfied the three-part *Craddock* test for setting aside a default judgment. *See Craddock v. Sunshine Bus Lines, Inc.*, 133 S.W.2d 124, 126 (Tex. 1939). We will affirm the district court's judgment.

---

[1] For the child's privacy, we refer to her using a pseudonym. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

BACKGROUND

Nitz and Bouffard have been engaged in a custody dispute involving Amy since 2013. The district court issued previous orders in suits affecting the parent-child relationship in 2014, 2016, and 2021. Bouffard filed her most recent suit to modify the parent-child relationship in November 2021. Nitz's counsel moved for a continuance, and in November 2022, the district court issued agreed temporary orders that, among other requirements, ordered Nitz to participate in Soberlink alcohol monitoring.

In January 2023, Bouffard filed her third amended petition. Bouffard attached an affidavit to her petition in which she stated that Nitz had failed to submit to Soberlink testing five times a day as he had agreed to do and that he was no longer testing. More specifically, she averred that Nitz "did one Soberlink test the morning of December 19, 2022 in order to get [Amy] back for his Christmas possession, and then he has refused to test since that date." She also referenced an incident from 2021 when Nitz left Amy with his girlfriend "to go drinking at a local bar" and that Amy had called Bouffard after being unable to contact Nitz and told Bouffard that she was "hiding in a closet" because the girlfriend "started drinking alcohol and was yelling at her." The district court issued a temporary restraining order prohibiting Nitz from having unsupervised possession of Amy and requiring him to comply with the Soberlink testing schedule.

The suit proceeded to a final hearing in December 2024. The hearing was scheduled for the afternoon of December 17, 2024. That morning, at 9:44 a.m., the court administrator sent an email to the parties informing them that the judge would be approximately fifteen to thirty minutes late but that "the parties should still appear at 1:30 p.m." as scheduled.

At 10:46 a.m., Nitz, who was proceeding pro se at the time,[2] sent the administrator the following email:

> Ms. Cleere,
>
> I fell off a ladder putting up Christmas decorations this morning and suffered a back injury. I am unable to attend the hearing today.
>
> Michael Nitz

Nitz did not send the email to Bouffard's counsel, but the court administrator forwarded the email to him. At the beginning of the hearing, Bouffard's counsel acknowledged his awareness of the email. The district court, after confirming with Bouffard's counsel that Nitz had been notified of the setting, proceeded with the hearing. The district court later issued its final order, ruling that Nitz, "although duly and properly notified of the hearing, did not appear, and wholly made default." The final order included modifications to the terms of Nitz's possession of and access to Amy and additional child support requirements.

Nitz, represented by new counsel, filed a motion for new trial in which he argued that the default judgment should be set aside because he did not have proper notice of the hearing or, in the alternative, because he satisfied the requirements of the *Craddock* test. No affidavit or other evidence was attached to the motion. The district court held a hearing on the motion, at which Nitz provided the following testimony regarding his failure to appear at the hearing:

---

[2] Nitz's former counsel had withdrawn from representing him in March 2024.

3

Q.     Okay. And so tell me what's going on with you on the morning of December 17th prior to your hearing?

A.     I'm just working, basically, at that point.

Q.     Okay. And did anything—you know, did you engage in any activity that caused you to be unable to attend the hearing?

A.     I was putting up Christmas lights, and I was installing them on the gutter. I fell off. I fell backwards. I basically landed on my rear. I had a previous injury from September where I broke my tailbone, and I re-broke it.

Q.     You re-broke your tailbone that day?

A.     Yes. Yes.

Q.     Okay. Did you attend a medical appointment to that effect?

A.     No.

Q.     Okay. Were you able to physically walk after the fall?

A.     I could walk.

Q.     Okay. And so what did you do when you, you know—I guess what time of day did you fall off the ladder?

A.     It was probably 9:30.

Q.     In the morning?

A.     A.M.

4

Q.      Okay.  And when did you first reach out to the court and [Bouffard's counsel] about your injury?

A.      I'd say it was midmorning.

Q.      Okay.

A.      10:00, 10:30.

On cross-examination, Nitz acknowledged that he had received notice of the hearing and that following his injury, he did not move for a continuance or ask the court if he could appear via phone or virtually.

At the conclusion of Nitz's testimony, the court asked Nitz additional questions about his failure to appear:

Q.      So can you just tell me a little bit more about the Christmas lights?  So you're putting up Christmas lights the morning of the hearing?

A.      Correct.

Q.      And you fell?

A.      Yes.

Q.      And what happened next, immediately after you fell?

A.      So I had—previously I broke my tailbone.

Q.      I don't care about that.  Immediately—

A.      So I fell—

5

Q.     Hold on.  Immediately after you fell, what happened next?

A.     I went in the house and laid on the floor.

Q.     Okay.  Was anybody home with you?

A.     No.

Q.     All right.  So you went in and laid on the floor for how long?

A.     Probably 30 minutes.

Q.     Then [what] did you do?

A.     Got up, got something to drink, took some medicine, painkillers.

Q.     Okay.  What time do you think you took the painkillers?

A.     Probably 10:00 a.m.

Q.     Okay. What did you do next?

A.     Just rested.  I was on the computer.  I saw an email from the court.  I knew I had to go to court.  I saw an email from the court stating that you were at lunch.  It was going to be a late lunch.  I responded that I wouldn't be able to make court because I just fell off a ladder.

Q.     Okay.  What did you do after that email at 10:00 something in the morning?  What did you do next?

A.     I just went and rested.

Q.     Okay.  What is the next thing you remember doing after that?

6

A.   I just rested that day. Initially, we had scheduled with my daughter that I had her that day. She wanted to do some caroling, so—I think we jived [sic] with her, and she was going to go do that, and I was—I was scheduled to pick her up that following day, so—

Q.   I want to know what else you did that day, December 17th.

A.   I don't think I did anything. Laid around.

Q.   You didn't leave the house?

A.   Not that I know of.

Q.   I mean, you said you re-broke your back?

A.   My tailbone.

Q.   Is that a bone?

A.   In my rear end, yes, sir.

Q.   Okay. And you said you re-broke it?

A.   Yes.

Q.   Okay. And from December 17th until now, did you ever go to a doctor to confirm that?

A.   No.

Q.   Okay. Did you seek—I think you testified earlier you never sought any medical attention for a refractured tailbone?

A.   When I initially fell off the horse [Nitz had experience riding horses], I got back on the horse, so I realized that this feels better, having a saddle under

7

my rear end, because it supports it. And it was the same feeling and—I just couldn't sit on anything flat.

Q. All right. But my point is you took—what kind of medication did you take? Tylenol?

A. It was probably codeine that I had.

Q. Okay. You saw in the prior correspondence between the attorneys in prior hearings that attorneys had requested to change hearing dates. Correct?

A. Yes.

Q. And so you saw that people would ask for a hearing date to be changed, and the parties would agree on a new date. You've seen that happen. Right?

A. I saw it once happen with [Nitz's former counsel] not being able to attend, an email from the court that I think was shown a while ago.

At the conclusion of the hearing, the district court took the matter under advisement and later denied the motion for new trial. Upon Nitz's request, the district court made findings of fact and conclusions of law, including that Nitz's "failure to appear at the Final Hearing was not a result of accident or mistake" and that his "failure to appear was a result of conscious indifference." This appeal followed.

**STANDARD OF REVIEW**

"We review a trial court's refusal to grant a motion for new trial for abuse of discretion." *Dolgencorp of Tex., Inc. v. Lerma*, 288 S.W.3d 922, 926 (Tex. 2009). The test for abuse of discretion is whether the court acted arbitrarily or unreasonably, "without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238,

8

241-42 (Tex. 1985). The guiding rule in this case is the *Craddock* test, which provides that a default judgment should be set aside and a new trial granted when the defaulting party establishes that (1) the failure to appear was not intentional or the result of conscious indifference, but was the result of an accident or mistake, (2) the motion for new trial sets up a meritorious defense, and (3) granting the motion will occasion no delay or otherwise injure the plaintiff. *Lerma*, 288 S.W.3d at 925 (citing *Craddock*, 133 S.W.2d at 126). "When a defaulting party moving for new trial meets all three elements of the *Craddock* test, then a trial court abuses its discretion if it fails to grant a new trial." *Id.* at 926.

**Notice**

In his first issue, Nitz asserts that he did not have proper notice of the final trial, which would entitle him to reversal of the default judgment. *See Custom-Crete, Inc. v. K-Bar Servs., Inc.*, 82 S.W.3d 655, 659 (Tex. App.—San Antonio 2002, no pet.) ("Failure to give the required notice constitutes lack of due process and is grounds for reversal."). Lack of notice would satisfy the first *Craddock* element and dispense with the defendant's need to prove the remaining two elements because the failure of notice amounts to a due-process violation. *See Lopez v. Lopez*, 757 S.W.2d 721, 723 (Tex. 1988) (per curiam) (citing *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 86–87 (1988)); *Smith v. Holmes*, 53 S.W.3d 815, 817 (Tex. App.—Austin 2001, no pet.).

Rule of Civil Procedure 245 provides that a Court may set a case for trial "with reasonable notice of not less than forty-five days to the parties of a first setting for trial, or by agreement of the parties." Tex. R. Civ. P. 245. However, "when a case previously has been set for trial, the Court may reset said contested case to a later date on any reasonable notice to the

9

parties or by agreement of the parties." *Id.* To determine what constitutes "reasonable notice" for a subsequent setting, "a court should look to the facts of the individual case . . . and not be guided by an arbitrary time period." *O'Connell v. O'Connell*, 843 S.W.2d 212, 215 (Tex. App.—Texarkana 1992, no writ).

Here, the record reflects that the first setting for the final trial was scheduled for June 14, 2024. Nitz acknowledges that he received notice of that setting on April 11, 2024, more than forty-five days prior to trial. However, that setting was canceled, and the final hearing was reset for December 17, 2024. Nitz did not receive notice of that setting until December 5, 2024, twelve days before the hearing. Nitz asserts that the December setting should be treated as a new setting rather than as a subsequent setting, requiring forty-five days' notice, and that twelve days' notice was not reasonable under the circumstances.

Rule 245 plainly provides that only the "first setting for trial" requires notice of "not less than forty-five days." *See* Tex. R. Civ. P. 245; *Osborn v. Osborn*, 961 S.W.2d 408, 411 (Tex. App.—Houston [1st Dist.] 1997, pet. denied) ("The plain import of rule 245 is that the court must give 45 days' notice of the first trial setting, but may reset the case to a later date on any reasonable notice."); *State Farm Fire & Cas. Co. v. Price*, 845 S.W.2d 427, 432 (Tex. App.—Amarillo 1992, writ dism'd by agr.) (explaining that according to "the clear language of rule 245," forty-five-day notice requirement applies only to first trial setting). That setting was in June, and Nitz received the required forty-five days' notice of that setting. The December setting was not a "new setting" as Nitz contends but rather a reset of the June setting, and therefore "any reasonable notice" was sufficient. *See* Tex. R. Civ. P. 245; *O'Connell*, 843 S.W.2d at 215.

10

Notice is reasonable when it provides a party with adequate time to prepare for trial or otherwise "protect their rights," for example, by moving to strike the setting and asking for a continuance. *See In re Marriage of Parker*, 20 S.W.3d 812, 819 (Tex. App.—Texarkana 2000, no pet.); *O'Connell*, 843 S.W.2d at 216-217. There is nothing in the record here to indicate that the twelve days' notice provided to Nitz was inadequate. At the hearing on the motion for new trial, counsel for Bouffard represented that when he suggested resetting the date of the final hearing to December 17,

> I have a whole chain of emails with the court, with [the amicus attorney for the child], and Mr. Nitz is copied on it, where I'm asking for dates, we're getting dates, we're agreeing to dates. He doesn't once respond to any of those emails and say, "Hey, I need 45 days' notice. I need time to hire counsel. That date doesn't work. We need a different date." He doesn't once respond.

When asked why he did not express any objections or concerns with the December 17 setting, Nitz testified, "It worked for me. I planned to be here." Nitz added that he was "prepared to represent myself, basically," at that hearing and that he had "put together exhibits" in preparation for the hearing. Nitz did not testify that the twelve days' notice failed to give him adequate time to prepare for trial or move for a continuance. Absent any evidence in the record that Nitz did not have adequate time, the district court would not have abused its discretion in concluding that Nitz was provided with reasonable notice of the hearing date.

We overrule Nitz's first issue.[3]

---

[3] The final hearing was previously set for December 5, 2024, before it was rescheduled for December 17 due to the amicus attorney's inability to attend the hearing on December 5. Nitz also asserts in this issue that he was not served with notice of the December 5 date because notice of that setting was erroneously emailed to his former counsel after counsel had withdrawn. However, because that setting was canceled, we cannot conclude on this record that any failure

11

*Craddock*

In his second issue, Nitz asserts that he satisfied the *Craddock* test for setting aside a default judgment. Specifically, he contends that his nonappearance at trial was neither intentional nor the result of conscious indifference, that he has set up a meritorious defense, and that a new trial would occasion no delay or otherwise injure Bouffard. We will focus our analysis on the first element of the *Craddock* test, as it is dispositive.

"A defendant satisfies its burden as to the first *Craddock* element when its factual assertions, if true, negate intentional or consciously indifferent conduct by the defendant and the factual assertions are not controverted by the plaintiff." *Sutherland v. Spencer*, 376 S.W.3d 752, 755 (Tex. 2012). "In determining whether the failure to appear was due to intentional disregard or conscious indifference we must look to the knowledge and acts of the defendant." *Strackbein v. Prewitt*, 671 S.W.2d 37, 39 (Tex. 1984); *see Lewis v. Housing Auth. of Austin*, No. 03-15-00800-CV, 2016 WL 7187481, at *5 (Tex. App.—Austin Dec. 7, 2016, no pet.) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 115 (Tex. 2006) (per curiam)). "When the evidence presented by the defaulting party is controverted by the opposing side, it is the duty of the trial court, as factfinder, to ascertain the facts surrounding the default, and in so doing to judge the credibility of witnesses and the weight to be given their testimony." *Lewis*, 2016 WL 7187481, at *5. "Because the trial court can view a witness's demeanor, the trial court, as factfinder, is given great latitude to believe or to disbelieve a witness's testimony, particularly if the witness is interested in the outcome." *Id.*

---

to serve Nitz with notice of it harmed him. *See* Tex. R. App. P. 44.1(a); *see also T.D. v. Texas Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 911 (Tex. App.—Austin 2024, no pet.).

12

Here, Nitz testified that he was unable to attend the hearing because he fell off a ladder while putting up Christmas lights and "landed on [his] rear." Although he claimed that the fall "re-broke" his tailbone from a previous injury, he did not see a doctor to confirm this self-diagnosis or seek any medical attention or care for the fall. He compared the injury to a previous fall off a horse, recounting that when he "got back on the horse," he realized that "this feels better, having a saddle under my rear end, because it supports it. And it was the same feeling and—I just couldn't sit on anything flat." Moreover, Nitz testified that he "could walk" after the fall and that immediately after he fell, he "went in the house and laid on the floor" for "[p]robably 30 minutes." After that, he "[g]ot up, got something to drink, took some medicine, painkillers." Then, after sending the email to the court administrator informing her that he would be unable to attend the hearing, he "just rested that day." When asked by the court what else he did that day, Nitz testified, "I don't think I did anything. Laid around." Nitz also acknowledged that he did not move for a continuance or ask to appear remotely. Although Nitz claimed that he did not know that he could ask to reschedule the hearing, the district court could have disbelieved this testimony in light of Nitz's having observed his former counsel move for a continuance earlier in the case and his receipt of emails between opposing counsel, the amicus attorney, and the court discussing moving the hearing date from December 5 to December 17.

Based on Nitz's testimony, the district court could have reasonably concluded that Nitz's purported injury was not so severe that it rendered him unable to attend the hearing or that even if it did, Nitz had the ability to ask for a continuance or appear remotely but chose not to do so. On this record, we cannot conclude that the district court abused its discretion in finding that Nitz's failure to appear was the result of conscious indifference and in refusing to set aside the default judgment for that reason. *See Vannerson v. Vannerson*, 857 S.W.2d 659, 665 (Tex.

13

App.—Houston [1st Dist.] 1993, writ denied), *overruled on other grounds by Gonzalez v. Gonzalez*, 679 S.W.3d 221, 224 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (en banc); *Johnson v. Edmonds*, 712 S.W.2d 651, 652–53 (Tex. App.—Fort Worth 1986, no writ); *see also In re E.P.C.*, No. 02-10-00050-CV, 2010 WL 5187691, at *3 (Tex. App.—Fort Worth Dec. 23, 2010, no pet.) (mem. op.) (party's failure to provide evidence documenting purported illness meant that party failed to satisfy *Craddock* test); *Nawas v. R & S Vending*, 920 S.W.2d 734, 738 (Tex. App.—Houston [1st Dist.] 1996, no writ) (concluding that party's actions during purported illness supported trial court's finding that absence from hearing was result of conscious indifference).

We overrule Nitz's second issue.

## CONCLUSION

We affirm the district court's order modifying the parent-child relationship.

_____

Gisela D. Triana, Justice

Before Justices Triana, Kelly, and Theofanis

Affirmed

Filed:   December 12, 2025

14